14-2378-cr
*United States v. Suarez*

In the
# United States Court of Appeals
## For the Second Circuit

————

August Term, 2014

No. 14-2378-cr

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

YESID RIOS SUAREZ, AKA SEALED DEFENDANT 2, AKA EL ENANO,[1]
*Defendant-Appellant.*

————

Appeal from the United States District Court
for the Southern District of New York.
No. 11-cr-836 (KBF) — Katherine B. Forrest, *Judge.*

————

Argued: April 20, 2015
Decided: June 30, 2015

————

Before: KEARSE, PARKER, AND WESLEY, *Circuit Judges.*

————

Defendant-appellant Yesid Rios Suarez appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York (Katherine B. Forrest, *Judge*) for conspiracy to manufacture and import five kilograms or more of

---

[1]     The Clerk of Court is directed to amend the caption as set forth above.

cocaine into the United States, in violation of 21 U.S.C. § 963. Suarez was extradited by the Republic of Colombia to face the charge in the United States on the condition that "a sentence of life imprisonment will not be sought or imposed." Suarez, who is 46 years old, contends on appeal that his 648-month (or, 54-year) sentence violates this condition because it is effectively a life sentence. We find that Suarez lacks prudential standing to raise an alleged violation of an extradition agreement unless the challenge is first raised by the extraditing nation. Accordingly, and for additional reasons explained in a summary order filed simultaneously with this opinion, the judgment of conviction is AFFIRMED.

Judge KEARSE concurs in a separate opinion.

————

> JOHN MERINGOLO, Meringolo Law, New York, NY, *for Defendant-Appellant Yesid Rios Suarez.*
>
> ADAM FEE, Assistant United States Attorney (Brian A. Jacobs, Assistant United States Attorney, *on the brief)*, for Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for Appellee.*

————

BARRINGTON D. PARKER, *Circuit Judge*:

## BACKGROUND

Since the early 1990s, Yesid Rios Suarez operated a large-scale drug trafficking organization out of Colombia and Venezuela. In September 2010, while Suarez was in Venezuela, he was convicted *in absentia* in Colombia of drug manufacturing and trafficking. Approximately one year later, Suarez was extradited from Venezuela to Colombia. In November 2011, the United States

transmitted a formal request to Colombia for the arrest and extradition of Suarez to face the charge at issue in this case – conspiracy to manufacture and import five kilograms or more of cocaine into the United States in violation of 21 U.S.C. § 963.

Suarez challenged the extradition in a Colombian court. In October 2012, the Colombian Ministry of Justice issued a resolution ordering Suarez's extradition on the condition that the United States government provide assurances that Suarez (1) would face prosecution only for conduct occurring after December 17, 1997; (2) would receive various due process protections; and (3) would not be "subjected to forced disappearance, torture or cruel, inhuman or degrading treatment or punishment or exile, life imprisonment or confiscation," JA 373. In March 2013, the United States provided those assurances in a Diplomatic Note to the Colombian government. Specifically, the United States promised that "[a]lthough the maximum statutory penalty for the charge for which extradition was approved is life imprisonment, the Government of the United States assures the Government of Colombia that a sentence of life imprisonment will not be sought or imposed . . . ." Gov't Add. 1. In May 2013, Suarez was extradited to the United States.

In February 2014, Suarez pled guilty to the conspiracy count, and in June 2014, he was sentenced to 648 months imprisonment and a $1 million fine. At sentencing, the district court "acknowledge[d] [that this] is effectively a life sentence" but ruled that it did not violate the terms of the extradition agreement because the sentence was a term of years, not a sentence of life imprisonment. JA 502. This appeal followed. As relevant to this opinion, Suarez, who is currently 46 years old, challenges his sentence on the ground that it violates the United States government's assurance that "a sentence

3

of life imprisonment will not be sought or imposed" because the sentence exceeds Suarez's life expectancy.[2]

## STANDARD OF REVIEW

"A district court's interpretation of an extradition agreement . . . involve[s] questions of law, and [is] therefore review[ed] . . . *de novo*." *United States v. Baez*, 349 F.3d 90, 92 (2d Cir. 2003).[3]

## DISCUSSION

"Based on international comity, the principle of specialty generally requires a country seeking extradition to adhere to any limitations placed on prosecution by the surrendering country." *Id*. Although the rule of specialty is typically applied in cases where the defendant is tried for a crime not enumerated in the applicable extradition treaty or agreement, it also "has application in the sentencing context." *United States v. Cuevas*, 496 F.3d 256, 262 (2d Cir. 2007). Because "the cauldron of circumstances in which extradition agreements are born implicate the foreign relations of the United States. . . , a district court delicately must balance its discretionary sentencing decision with the principles of international comity in which the rule of specialty sounds." *Baez*, 349 F.3d at 93.

However, this Court has never "conclusively decided whether a defendant has standing to challenge his sentence on the ground that it violates the terms of the treaty or decree authorizing his

---

[2]     Suarez also appeals the application of various Sentencing Guideline enhancements, the substantive reasonableness of his sentence and the fine imposed by the district court, and the judgment of conviction on the ground that he was denied the right to counsel during a critical part of plea negotiations. These arguments are addressed in the summary order filed simultaneously with this opinion.

[3]     The Government's failure to raise the issue of prudential standing before the district court does not affect our duty to decide it. *See Thompson v. Cnty. of Franklin*, 15 F.3d 245, 248 (2d Cir. 1994)("The jurisdictional nature of the standing inquiry, therefore, convinces us that we have an independent obligation to examine [plaintiff's] standing under arguments not raised below[.]").

extradition," or whether the right to object is held solely by the extraditing nation. *Cuevas*, 496 F.3d at 262. Rather, we have rejected those challenges on the merits without deciding the standing issue. *See, e.g.*, *United States v. Fusco*, 560 Fed. App'x 43, 45 n.1 (2d Cir. 2014), *cert denied*. 135 S. Ct. 730 (2014) ("We need not resolve whether Fusco has prudential standing to challenge his prosecution and sentencing on the grounds that they violate the terms of the Extradition Treaty or the rule of specialty, because his argument plainly fails on the merits."); *United States v. Frankel*, 443 Fed. App'x. 603, 606 (2d Cir. 2011) ("We do not decide whether Frankel has standing to assert the rule of specialty as a basis to challenge his sentence because his argument fails on the merits."); *United States v. Banks*, 464 F.3d 184, 191 (2d Cir. 2006) (declining to "resolve" whether "the right to enforce [an extradition] agreement belongs to the Dominican Republic" and not to the defendant "because we find no error in the district court's findings or proceedings").

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance. This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limits on its exercise.'" *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Unlike constitutional standing, which focuses on whether a litigant sustained a cognizable injury-in-fact, "[t]he 'prudential standing rule . . . bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves.'" *Rajamin v. Deutsche Bank Nat. Trust Co.*, 757 F.3d 79, 86 (2d Cir. 2014) (quoting *Warth*, 422 U.S. at 509). "When both limitations [potentially] present themselves, we may assume Article III standing and address 'the alternative threshold question' of whether a party has prudential standing." *Hillside Metro Assoc., LLC v. JP Morgan Chase Bank, Nat.*

*Ass'n*, 747 F.3d 44, 48 (2d Cir. 2014) (quoting *Kowalski*, 543 U.S. at 129. "In other words, we may consider third-party prudential standing even before Article III standing." *Id*. (internal quotation marks omitted).

Because the prudential standing rule requires that an individual "'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties,'" *Rajamin*, 757 F.3d at 86 (quoting *Warth*, 422 U.S. at 499), we must first determine who has legal rights or interests under the orders and Diplomatic Note that achieved Suarez's extradition. Although the United States and Colombia have had a formal extradition treaty since 1982, extradition is commonly negotiated on a case-by-case basis through diplomatic channels because of amendments to the constitution of Colombia that expressly prohibit the extradition of Colombian nationals except for a limited scope of offenses. *See* U.S. Department of State, *Third Report on International Extradition Submitted to Congress Pursuant to Section 3203 of the Emergency Supplemental Act, 2000, as enacted in the Military Construction Appropriations Act, 2001, Public Law 106-246 Related to Plan Colombia*, http://www.state.gov/s/l/16164.htm. For purposes of our analysis here, extradition documents such as Diplomatic Notes implicate the same international legal rights as treaties because "a violation of [an] extradition agreement may be an affront to the surrendering sovereign." *Baez*, 349 F.3d at 92; *accord Fiocconi v. Attorney General of the United States*, 462 F.2d 475, 479-80 (2d Cir. 1972) (holding that the rule of specialty is a general principle of international law that applies with equal force to extraditions accomplished by treaty and by comity).

Generally speaking, "absent protest or objection by the offended sovereign, [a defendant] has no standing to raise the

violation of international law as an issue." *United States v. Reed*, 639 F.2d 896, 902 (2d Cir. 1981). That is because international agreements, including treaties, "do not create privately enforceable rights in the absence of express language to the contrary," *Mora v. New York*, 524 F.3d 183, 201 (2d Cir. 2008), or some other indication "that the intent of the treaty drafters was to confer rights that could be vindicated in the manner sought by the affected individuals," *id.* at 203.

"As a matter of international law, the principle of specialty has been viewed as a privilege of the asylum state, designed to protect its dignity and interests, rather than a right accruing to the accused." *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973). "[T]he object of the rule was to prevent the United States from violating international obligations." *Fiocconi*, 462 F.3d at 480. These concerns apply equally whether a criminal defendant objects based on the rule of specialty or based on the interpretation of an extradition treaty or Diplomatic Note. Because "[t]he provisions in question are designed to protect the sovereignty of states, . . . it is plainly the offended states which must in the first instance determine whether a violation of sovereignty occurred, or requires redress." *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 67 (2d Cir. 1975).

Any individual right that Suarez may have under the terms of his extradition is "only derivative through the state[]." *Id.* (internal quotation marks omitted). Thus, Suarez would only have prudential standing to raise the claim that his sentence violated the terms of his extradition if the Government of Colombia first makes an official protest. *See, e.g.*, *United States v. Alvarez-Machain*, 504 U.S. 655, 659 (1992) ("[L]etters from the Mexican Government to the United States Government served as an official protest of the Treaty violation."); *Gengler*, 510 F.3d at 67 n. 8 ("[T]o support this claim[,] Toscanino

7

would have to prove that the Uruguayan government registered an official protest with the United States Department of State.").  It may be prudent, as a matter of general policy, for the United States Attorney's Office to ensure that the State Department is kept apprised when extradited defendants plead guilty, proceed to trial, or are sentenced.

## CONCLUSION

For these reasons, and for the reasons explained in the simultaneously filed summary order, we AFFIRM the judgment of the district court.

KEARSE, Circuit Judge, concurring:

I concur in the judgment, on the ground that the diplomatic agreement that led to the extradition of defendant Yesid Rios Suarez to the United States from Colombia should be read in accordance with the language to which the United States and Colombia agreed.

"Based on international comity, the principle of speciality [sic] generally requires a country seeking extradition to adhere to any limitations placed on prosecution by the surrendering country." United States v. Baez, 349 F.3d 90, 92 (2d Cir. 2003). In Baez, we considered a challenge to the sentence of life imprisonment imposed on a defendant who had been extradited to the United States from Colombia pursuant to an agreement recorded in a diplomatic note in which the United States agreed, inter alia, that it would not seek a sentence of life imprisonment and that if the United States court were "'nevertheless [to] impose a sentence of life imprisonment,'" the United States's "'executive authority will take appropriate action to formally request that the court commute such sentence to a term of years.'" Id. (quoting Diplomatic Note No. 1206 (emphasis mine)). Following the defendant's conviction, the district court imposed a sentence of life imprisonment. Thereafter, "[a]s contemplated by Diplomatic Note No. 1206, the United States, through the U.S. Attorney for the Southern District of New York, requested that the District Court sentence [the defendant] to a term of years." 349 F.3d at 92-93. We held that the government thereby "fulfilled the commitment it made in Diplomatic Note No. 1206." Id. at 93. Accord United States v. Riascos, 537 F. App'x 898, 900-01 (11th Cir. 2013); United States v. Corona-Verbera, 509 F.3d 1105, 1121 (9th Cir. 2007), cert. denied, 555 U.S. 865 (2008).

In United States v. Lopez-Imitalo, 305 F. App'x 818 (2d Cir. 2009), we considered a challenge to a 40-year prison term imposed on a 58-year-old defendant (see the defendant's brief on appeal, 2007 WL 6370252), who had been extradited to the United States from Colombia pursuant to an agreement in which, as in the agreement in Baez, the United States promised it would not seek a sentence of life imprisonment. We rejected the defendant's "argument that the Government breached the agreement by seeking a sentence of 60 years, which he assert[ed wa]s the functional equivalent of life imprisonment"; and we stated that there was no violation of the extradition agreement "[e]ven if the district court's sentence of 40 years were deemed to be a sentence of 'life imprisonment.'" 305 F. App'x at 819. We stated that "[o]ur decision in . . . Baez . . . compels the conclusion that the rule of specialty [sic] was not violated . . . ." Id.

> Had the respective governments intended the Diplomatic Note to be an assurance that the U.S. government would not request a determinate sentence exceeding [the defendant's] expected lifespan, they could have drafted the note to say that.

Id. They did not do so, either in that case or here.

2